PHELPS, RESPONDENT, v. UNION CENTRAL LIFE INSURANCE CO., APPELLANT.

(No. 7,825.)

(Submitted November 10, 1938. Resubmitted January 10, 1939. Decided March 10, 1939.)

[88 Pac. (2d) 58.]

*Mr. Merle C. Groene,* for Appellant, submitted an original, a reply and a supplemental brief, and argued the cause orally.

*Mr. C. E. Baker* and *Mr. George E. Hurd,* for Respondent, submitted a brief, and argued the cause orally.

MR. JUSTICE STEWART, delivered the opinion of the court.

This cause was previously before this court. (105 Mont. 195, 71 Pac. (2d) 887.) Reference to the former opinion obviates the necessity for an elaborate statement of facts. We shall not reiterate what was there recited, except where it becomes necessary to develop a particular point. The judgment of the district court was reversed and the cause remanded for a new trial. The new trial occurred on the original pleadings. Verdict and judgment were again for plaintiff, and defendant has appealed.

Numerous specifications of error were assigned on this appeal. It is not necessary to discuss all of them.

At one stage of the proceedings the defendant presented a motion for a continuance. The court refused to grant the continuance, and one of the specifications is based upon that ruling.

It is not necessary to discuss the matter at length, as we believe the case of *Baker* v. *Tullock,* 106 Mont. 375, 77 Pac. (2d) 1035, is controlling in the premises.

Another specification of error involves the demand of the ▮ defendant to require an amendment to the complaint by the addition of the name of one of plaintiff's counsel as a party plaintiff. This was apparently brought about by the fact that counsel had asserted an attorney's lien against the cause of action for more than half the amount thereof. It was the con-tention of defendant that counsel thereby became a real party in interest as contemplated by section 9067, Revised Codes. In this we think counsel for defendant was in error. (See *Lefebure* v. *Baker,* 69 Mont. 193, 220 Pac. 1111.) The lien mentioned was given to counsel by section 8993, and regardless of the amount it was incidental to plaintiff's cause of action.

The complaint alleged that a copartnership, consisting of ▮ David V. Phelps, plaintiff, and his son, did and performed certain work and services in the matter of plowing for the defendant; that such were done at the special instance and request of defendant, and that defendant promised to pay the co-partnership at certain specified rates therefor. It further alleged the reasonable value of the work and services and the non-payment therefor. The complaint contains the necessary allegations for a suit on *quantum meruit,* and in addition contains allegations of an express promise to pay a certain sum per acre for the plowing. (Compare *Brown* v. *Crown Gold Min. Co.,* 150 Cal. 376, 89 Pac. 86; *Merywethers* v. *Youmans,* 81 Kan. 309, 105 Pac. 545.) The objection urged here against the sufficiency of the complaint was urged on the previous appeal. We did not then deem the matter of sufficient merit to constitute reversible error, and we do not now.

In the former opinion we did not attempt to pass upon the question as to whether agent Sowter actually did enter into the contract in question, because we believed that certain relevant testimony, bearing directly on that question, had been erroneously rejected by the court.

A comprehensive examination of the records seems to us to establish the undisputed fact that defendant owned a number of farms in Fergus county; that Sowter was its field man or some kind of an agent with authority to negotiate sales and leases, subject to the approval of his superiors, to collect rent and to protect the company's interests generally. This much both sides admit Sowter could do. Authority beyond that point is where the difficulty arose. On one hand the company asserted that Sowter had no authority or right to consummate any contract for the sale of land, the leasing thereof, or to in any manner dispose of the company's interests or property without specific approval. In other words, the defendant company claims that Sowter was authorized to do little more than contact prospective tenants, negotiate with them and, finally, if in his opinion a prospect met the company's requirements, he could recommend him to it on a particular land deal. Plaintiff, however, alleged an independent contract involving the payment of money by the company to him in exchange for work and labor, material and machinery furnished in the plowing of certain company-owned lands. This was an act which the company expressly asserts their field agent had no authority to do.

Under our view of the questions presented, this controverted issue becomes unimportant, it being admitted by both parties that Sowter actually did have power to make preliminary negotiations and recommend various farm deals which were incidentally concerned with plowing and a system of payment therefor. Likewise, as will at once appear obvious, the question of the admissibility of deceased agent Sowter's asserted statements also becomes unimportant in arriving at a decision, because of the much broader ground upon which the issues must ultimately be determined, namely, the evidence as a whole.

It appears that David V. Phelps, one of the assignors of the claim to plaintiff, had had previous dealings with the defendant company through field agent Sowter; in fact, Sowter secured his written application to purchase certain of the company's farms on a crop payment plan contract. These farms were referred to in the testimony as the "home place." Such plan

contemplated payment of a certain base price for land, to which were to be added, in ascertaining the ultimate purchase price, certain advancements made to the tenant to enable him to carry on farming operations. These advancements consisted of fuel, machinery, living expenses and, in fact, everything necessary to finance the occupant and get the cultivation and farming of the land under way.

Upon Sowter's recommendation, David Phelps was given a written contract to purchase the home place on such a crop payment basis. This was in 1929. The next year one Fred Triepke, also operating some of defendant's lands under a similar cropping contract, gave up his contract. When this occurred one H. B. Smith, who was defendant's Assistant Montana Financial Correspondent, suggested to Sowter that he interest David Phelps in taking over the Triepke contract in addition to the one he already had, with the idea that the places could be operated together. Presumably with this plan in mind, Sowter called upon Phelps in an effort to work out a deal along the lines suggested. Thus it will be observed that Sowter did call at the Phelps home, and that some character of negotiations occurred. What these negotiations were is the difference that furnished the grounds for this lawsuit.

The parties advance different theories as to what agreement or arrangement, if any, was actually discussed or entered into with relation to the Triepke land. Defendant claims that Phelps & Son formed a partnership for the express purpose of taking over the land, and that they understood they were to take it over on the basis of the Triepke contract, which, as before noted, was one to purchase the land on a crop payment basis. The Triepke contract apparently also provided for certain advancements for plowing. It is plaintiff's contention that through the efforts of Sowter, Phelps & Son were hired to plow the Triepke place at a definite price of four dollars per acre for new sod, and two dollars per acre for rebreaking. Plaintiff's theory is that this employment had nothing to do with a crop payment plan for the ultimate purchase of the land.

Evidence presented on behalf of the plaintiff consisted of his testimony given at the first trial, his deposition taken before that, testimony of David Phelps and also his deposition taken before the first trial, and the testimony of plaintiff's mother. These witnesses testified at the previous trials. In addition thereto, and in accordance with our former decision, plaintiff produced five additional witnesses, all of whom had had negotiations of some character with agent Sowter.

It should be noted that the new contract to cover the Triepke land was never finally drawn by defendant. The old Triepke contract, or a copy thereof, apparently came into the hands of Phelps for his approval, pending the time that his own should be drawn. Likewise the contract upon which plaintiff seeks to recover was never reduced to writing, but was simply an oral one allegedly between Sowter on behalf of the company, and Phelps & Son. It is thus apparent that both parties base their case upon oral contracts—the plaintiff as just stated, and defendant on an oral understanding through Sowter and the Billings office with Phelps, that Phelps & Son were to plow and farm the Triepke place on the basis of Triepke's contract.

An examination of the testimony, depositions and exhibits offered in the course of three trials presents a somewhat confusing picture of some kind of an oral contract discussed between the parties and, at least, informally agreed upon. The testimony of plaintiff's additional witnesses and for whose testimony we remanded the cause for retrial has thrown some light on the facts concerning the arrangement between plaintiff and defendant. It is not necessary to set out such testimony in detail. Suffice it to say that the evidence as a whole in our opinion does show that an oral contract of some sort was entered into between the parties.

Plaintiff having pleaded the reasonable value of the services and relied upon *quantum meruit,* in addition to other facts to support his alleged oral contract, it was not actually necessary for the jury to determine whether plaintiff's version of the oral contract was sustained by the evidence, if the cause of action could be sustained on any theory. It could find for

plaintiff upon an implied contract for the reasonable value of services rendered. It is likewise unnecessary for us to now determine that question so long as the evidence shows some form of oral contract entered into, services performed thereunder, and the reasonable value thereof.

Among the numerous exhibits certified appear defendant's crop payment plan contracts entered into with several witnesses. One is the contract under which David Phelps operated on the home place, and two others are nearly identical contracts with only slight variation in terms, which were entered into by two of the additional witnesses called upon the new trial of the case. These contracts all contain provisions relating to payments and advances for breaking and rebreaking. They provide for actual payments upon a certain schedule of prices per acre, depending upon the type of ground plowed, and are optional upon the part of defendant, in that they reserve the right to credit plowing payments against advances made to a party under a contract. Part of the scheduled payments was to be paid in cash and part credited on the contract. To illustrate: If a tenant did $1,500 worth of plowing, defendant was obliged to pay a specified part of it in cash, but could credit the balance on the contract. If, however advances were made, the cash payment due could also be credited, at the defendant's option, on the advances. The advances, as before stated, were amounts that would be added to the base price of the land which would automatically increase the ultimate price to be paid therefor. Deducting the plowing payments from the advances would reduce the purchase price in that amount. In any event, an important point we wish to make clear is that defendant agreed in these crop payment contracts to actually pay some cash for plowing done, or credit payments due against advancements made.

The Triepke contract, according to defendant's evidence, was such a contract as those just discussed. It is not before us as an exhibit, so we must assume that its terms relating to plowing payments were similar to the ones mentioned. The course of conduct pursued by Phelps & Son with relation to the Triepke land seems to have confined itself to a similar routine to that

under which David Phelps operated the home place. It also seemed to approximate what was done by the new witnesses, Steadman, Larson and Donner. The first two witnesses mentioned operated under crop payment contracts, while Donner operated under some kind of a lease. The exhibits bear out the testimony of the witnesses. This course of conduct was obviously acquiesced in not only by Sowter, but by the Billings office as well.

According to defendant's evidence, all that actually remained to be done toward getting the Triepke contract rewritten in similar terms, in favor of Phelps & Son, was the mere detail of drawing it. This the Billings office neglected to do until finally, with prospects of a crop failure in sight, it decided it would be useless to draw a contract that would be in default from its inception. Nevertheless, up until this time both parties apparently pursued a course of conduct similar to that pursued under the written contracts. Phelps & Son proceeded with the plowing and farming of the land, and the defendant apparently cooperated in the matter of finances and otherwise. This course was continued for a time, but later the plan did not work out, probably on account of crop failure. In any event, the plowing was done and some seeding, but no profitable crops were harvested. The result was that defendant never did execute a written contract on the Triepke place in favor of Phelps & Son.

As a finale to the deal that did not work out, the cause of action of Phelps & Son was assigned to plaintiff, who instituted this action to recover compensation for the plowing that the partnership had performed and for which, according to the contracts in evidence, defendant was obligated to pay some cash unless it could be shown that it had paid the same by means of advances under the terms of a land contract.

Plaintiff alleged and proved that the work was done and the materials were furnished. He pleaded the reasonable value thereof, which was the same as that scheduled in the land contracts, and that defendant had not made payment. It is only fair to observe that the evidence, particularly the exhibits, in-

dicates that some advancements must have been made by the company to the partnership through David Phelps, but the amount of such advancements, if made, does not definitely appear. Defendant attempted to show through witness Smith that advancements had been made to Phelps & Son under the Triepke form of contract which was never executed, in excess of the amount allocated to take care of farming operations, including plowing of the place. Smith's testimony that advancements had been made sufficient to more than pay for the plowing was in the most general terms, but, if true, it presented a good defense to the plaintiff's cause of action. However, defendant did not attempt to establish the payment of such advancements by means of office records, or accounts, or otherwise. No itemization was presented, but defendant stood upon the bare assertion that the obligation for the plowing had been discharged by means of advancements.

The plowing was admittedly done at the solicitation and under the direction of defendant company, through its Billings office and through agent Sowter. The testimony of plaintiff that no payments were received for the work done was definite and specific, and while the Phelps people varied their testimony somewhat from time to time in the different trials, nevertheless all of these facts were presented to the jury and impeaching questions were asked, and the jury had all of the facts before it. Defendant attempted to show that the amount of the plowing payments contemplated on the Triepke place were by actual agreement of the parties credited against advances made to David Phelps on his home place contract. It is defendant's contention that the mutual agreement was that the bookkeeping details of the two places were to be carried under the David Phelps personal account. Such agreement was denied by Phelps and the jury apparently believed him. Again, no attempt was made to offer the books and accounts to show that such an arrangement was actually carried into effect. It seems to us that it would have been a very simple matter for defendant to show by its office records that the asserted advances and

credits were all made, and that the accounts were carried as it contended. Neither payment nor offset was pleaded or proved by defendant, and counsel stated on the second trial that defendant was not claiming payment. It has apparently been defendant's theory throughout the three trials that advances made by it to Phelps & Son, and to David Phelps, under crop payment agreements, more than exceeded the amounts that would have been due for plowing had no advances been made. However, this situation was not established to the satisfaction of the jury. In view of the state of the record, we are in no position to say that the jury did not proceed in a justifiable manner in the light of the facts before it.

To summarize, it may be fairly said that the evidence shows ▮ that some type of oral agreement was entered into between the parties for farming and plowing. The jury may have believed that an independent contract for plowing was entered into, or that the agreement was merely an oral contract to enter into a written crop payment plan contract for the Triepke land, the latter being defendant's theory of the case. In any event, an examination of defendant's crop payment plan contract disclosed that payments for plowing were intended to be made to the tenants where advances did not exceed the amount of such payments. The testimony of the new witnesses on the third trial illustrated that such procedure was carried out by defendant with respect to them. Plaintiff's evidence is that defendant did not make good on its promise to pay the partnership for plowing done, and the record does not show that the amounts earned by Phelps were ever offset or in any way compensated by advances. As we have said, some sort of advances were probably made, but the jury apparently did not believe that the proof offered was sufficiently positive and strong enough to establish the fact. In determining that fact upon the evidence, the jury was within its rights. We cannot say that the verdict was not supported by the testimony. We can say that the jury had basis for deciding that plaintiff's assignors lived up to their end of a contract which was never reduced to writing,

in the absence of a showing that advances were made to compensate for the plowing.

Judgment of the district court affirmed.

Mr. Chief Justice Johnson and Associate Justices Angstman and Erickson concur.

Mr. Justice Morris:

I concur in the result of the foregoing opinion but not in all said therein.

When this controversy was before this court in the previous case we reversed the district court and remanded the action for a new trial on error by the district court in denying offered testimony by one Steadman, who, as contended by counsel for plaintiff, would testify that he had done plowing for the defendant at the request of defendant's agent, Sowter, and, in accordance with such agreement with Sowter, had been paid by the defendant for such plowing. Without such testimony or evidence of like effect, the record before us in that case showed Sowter to have been merely a contact man, without power to contract and bind the defendant, but if Steadman's testimony had been received and was substantially in accord with what counsel contended it would be, it would have established Sowter's character as a general agent instead of a mere contact man or special agent.

On the trial had in the district court in the proceeding now before us, Steadman's testimony, formerly rejected, was received along with the testimony of other witnesses who testified substantially to the same effect, and such testimony supplied the missing link that made the reversal in the former hearing necessary.